# APPENDIX

Photos /Attachments

| | | |
|---|---|---|
| Letter to Mayor Miguel Romero | 21 MAR 2024 | D-1 |
| Letter to Ms. Elba Negrón Rodríguez | 14 AUG 2023 | D-2 |
| Letter to Luma Energy | 09 AUG 2023 | D-3 |
| Letter to Municipality of San Juan | 25 MAY 2022 | D-4 |
| Case 220P-58289QE-SJ | 27 FEB 2024 | D-5 |
| Letter to Reinaldo Paniagua Látimer (CRIM) | 22 JUL 2022 | D-6 |
| Letter to Mayor Carmen Yulin Cruz | 11 APR 2013 | D-7 |
| Letter to Police Col. Adalberto Mercado | 27 OCT 2003 | D-8 |
| Letter to Mayor Jorge Santini | 08 DEC 2003 | D-9 |

A-1

Ese es el resultado del sondeo Tolerancia a la Corrupción Gubernamental, en el que más de la mitad de los participantes, aun cuando expresan desconfianza, acudirán a votar a las elecciones de noviembre. >P3/4/6

POLÍTICOS Y PARTIDOS ARROPADOS POR LA CORRUPCIÓN

El Vocero Newspaper – 26 MAR 2024

Politicians and Parties are Covered by Corruption
-- more than half of the citizens polled held this mistrust

A-2
Excerpts from Municipality of San Juan Website

Con el compromiso de servirles a todos los sanjuaneros, en enero del 2017 Miguel A. Romero Lugo comienza su primer término como oficial electo, sirviendo como Senador del Distrito de San Juan, cargo que completó en diciembre del 2020.

Desde el Senado, Miguel A. Romero Lugo demostró su compromiso con todos los sanjuaneros a través de importante legislación para beneficio de nuestra Ciudad Capital, tal como:

la *Ley de Manejo de Estorbos Públicos y Reconstrucción Urbana de Santurce y Río Piedras*,

que busca devolverles el brillo a estas zonas a través de la reconstrucción de sus edificios;



P-1

2003 Construction Garbage Dumped on Sidewalk



P-2

Contrast: 2003 Auxilio Mutuo Monopoly
        Trees Invade the Power Lines
        Overgrown Vegetation
        Construction Garbage, etc.





P-3                                    P-4

04 DEC 2003 New Gates Installed



P-5

04 DEC 2003 Contrast
Auxilio Mutuo Monopoly still overgrown
Garbage not removed



P-6

Contrast 2005
Auxilio Mutuo Monopoly
Overgrown and Garbage
Trees invade Powerline



P-7

29 MAR 2013
Auxilio Mutuo Monopoly Trees
Close to Powerline
We "girdled" the foremost tree since its
    Roots had already invaded our property



P-8

01 APR 2013



P-9

13 MAY 2022



P-10

MAY 2022
Garbage by Others
Branches deposited by Auxilio Mutuo
And Others, etc.



P-11

JUL 2023





P-12

P-13

JUL 2023 Street View Auxilio Mutuo Property 13 MAR 2024

P-14

Letter to LUMA- 09 AUG 2023
Letter to Municipality of San Juan - 14 AUG 2023

P-15

P-16

11 JAN 2024

P-17

15 MAR 2024

D - 1

21 de marzo de 2024
Entregada a la Mano

Hon. Miguel A. Romero Lugo
Alcalde del Municipio de San Juan

**SUMA URGENCIA**

Estimado Alcalde Romero:

Acudimos a usted en torno a la residencia ubicada en la Calle Ponce 16, Hato Rey. La misma ha pertenecido a nuestra familia por generaciones: es el hogar donde nos criamos, y donde se criaron mis hijos. No encontramos como describir la tristeza que nos invade al ver la propiedad en sus circunstancias actuales.

Las fotos y documentos incluidas en la presente describen asuntos que nunca debieron de ocurrir; y más aún, nunca debieron repetirse. La residencia se encontraba en perfectas condiciones cuando nos trasladamos a la casa de mis padres para atender su enfermedad. Todo ocurre en el área Metropolitana; y no podíamos imaginar el nivel de criminalidad y abuso que arroparía la propiedad. Los impuestos del CRIM se pagan anualmente sin falta.

VANDALISMO. Las propiedades Desocupadas han proliferado por toda el área metropolitana. Circunstancias personales y económicas han propulsado esta condición; y a tal punto, que en sectores como Santurce hay secciones enteras que prácticamente están Desocupadas y cubiertas de grafiti. Esta situación se agrava por el Vandalismo y criminalidad producto de la plaga de drogadictos y maleantes que infestan la ciudad. Ya se habla de puntos de droga como hablar de Burger King, Taco Bell, o cualquier otro negocio conocido. Peor aún, la Policía aparenta menospreciar esta situación; y refleja un desinterés por defender la propiedad.

Fabricación, Manipulación, Subterfugio, y Agendas Escondidas. Bajo estas circunstancias, surge además la preocupación de que entidades inescrupulosas manipulen el gobierno para usurpar la propiedad de aquellos que ya están agobiados por Vandalismo, situación económica, etc. El Tribunal Federal supervisa la Reforma de la Policía en parte por la propensión a fabricar acusaciones; se ha demostrado que el Depto. de Justicia ha procesado a inocentes sin prueba alguna; y las noticias comunican casos de Alcaldes y otros envueltos en corrupción y subterfugio; etc. Alegaciones de estorbo público pueden prestarse para Agendas Escondidas en torno a la propiedad privada.

Alcalde Romero, nos sorprende que el Municipio de San Juan pretenda declarar nuestra propiedad como Estorbo Público (vea adjunto copia del texto). La propiedad disfruta de una excelente ubicación en un buen vecindario, y de fácil acceso a puntos importantes de la Capital. Aun en las condiciones actuales, una inspección podrá constatar que la residencia no es, y *nunca ha sido*, un estorbo público – todo lo contrario, es una propiedad *codiciada* por muchos. Precisamente, mientras se intenta *fabricar* una acusación de Estorbo Público; se pretende ocultar indebidamente el **peligro claro y presente** de la infestación de árboles provenientes de los terrenos del Hospital Auxilio Mutuo —algunos de estos árboles presentan el peligro de **colapso inminente**, y hace largo rato ameritan la **atención y acción inmediata** de parte del Municipio de San Juan.

Alcalde Romero, incluimos en la presente fotos de la situación; sin embargo, le ruego que visite el lugar de manera que pueda constatar las circunstancias personalmente.

Algunos de los aspectos notables de los documentos incluidos en la presente:

1. Fabricación Persistente. Hace dos (2) años informamos los hechos relevantes a la Oficina de Permisos – Estorbos Públicos. (vea Carta del 25 de mayo de 2022). Entendíamos que la situación estaba esclarecida; y nos sorprende que se persiste en fabricar la alegación de estorbo público.

2. Ocultar Fraudulentamente El Vandalismo Rampante. (ver texto de Querella) Se pretende ocultar que los daños a la propiedad resultan de un Vandalismo repetido e incremental; que a su vez refleja el fracaso /dejadez de la Policía en proveer seguridad al área.

3. Fabricación Fraudulenta de Abandono. El concepto de Abandono es simple, y claramente NO APLICA en referencia a la referida propiedad. Según los diccionarios, el concepto legal de Abandono consiste en lo siguiente:
   - ⇒ "Renuncia" que se hace, "de bienes que le pertenecen"; y que "pasan a no tener dueño" conocido.
   - ⇒ Dejar una cosa, o a una propiedad, "con renuncia de todo derecho a ella".

   La Oficina de Permisos pretende fabricar Abandono *cuando es todo lo contrario*; y los propios expedientes reflejan que nunca hubo "renuncia" alguna, sino nuestra continua presencia y protesta en contra de la fabricación de Abandono. La presente es otra muestra adicional de nuestra presencia y protesta; y el Municipio ha cobrado el impuesto del CRIM anualmente y sin falta.

4. El Municipio de San Juan No Tiene Concepto Alguno de Seguridad Pública. No sólo se fabrica un Abandono, sino que se pretende encubrir que nuestra propiedad ha sido víctima de Vandalismo rampante —y para colmo se pretende imputar que la víctima es ahora la fuente de la falta de seguridad.

5. Ocultar Fraudulentamente un Peligro Inminente a la Seguridad Pública. Para mayor agravio, se pretende encubrir la Infestación de Arboles de los terrenos del Hospital Auxilio Mutuo —y ocultar fraudulentamente el peligro que representa el colapso de algunos de esos árboles. Hace años hemos levantado la voz de alerta, pero el Municipio de San Juan permanece en apatía y dejadez ante un asunto crítico de Seguridad Pública.

6. El Municipio de San Juan No Tiene Concepto Alguno de Estructura. En el contexto relevante, Estructura se refiere a la "armadura que sustenta un edificio"; si el Municipio tuviera concepto de una "armadura que sustenta", ya hubiera actuado para remover el Peligro Inminente de la infestación de los árboles del Auxilio Mutuo. Los árboles secos van perdiendo la "armadura que sustenta", y por eso representan el peligro de colapso.

7. La Fabricación de la Estructura "Inadecuada para ser Habitada". La Oficina de Permisos no presenta fundamento alguno sobre la "Estructura" de nuestra propiedad; ni tampoco presenta hecho alguno que impida que la propiedad sea reparada, modificada, habitada, usada para fines comerciales, etc., etc., etc.

8. La Fabricación de Problemas de Salud. La Oficina de Permisos no presenta base alguna para identificar problema alguno de Salud. En contraste, pretende encubrir el Peligro Inminente de la

infestación de los árboles del Auxilio Mutuo —el colapso de esos árboles definitivamente puede causarle un problema de Salud a personas que transitan por el área.

9. Fabricación y Ofuscación en Torno a Energía Eléctrica y Agua Potable. Las Ordenanzas Municipales no pueden suprimir los Derechos Civiles de los Propietarios. Según lo presentado por la Oficina de Permisos, la mera ausencia de Energía Eléctrica y/o Agua Potable convierte a una propiedad en Estorbo Público. Las consecuencias de esa ofuscación son nefastas: es común que en propiedades desocupadas se cancelen los servicios de Electricidad y Agua. Más aún, una de las prácticas del Vandalismo es el hurto de cobre; lo que conlleva impedir los servicios de Electricidad y Agua. Es decir, ahora las propiedades desocupadas y/o vandalizadas pueden ser declaradas Estorbo Público a puro capricho y antojo.

10. Ofuscación y Fabricación de Alegaciones de Limpieza. Es claro que, estando desocupada, nuestra propiedad no genera basura y problemas de Limpieza. Por otro lado, al igual que el Vandalismo Rampante, la Oficina de Permisos pretende Ocultar Fraudulentamente la acción criminal de aquellos que lanzan basura y desechos sobre la propiedad —y sobre el área en general. Una vez más, intentan imputar a la víctima la acción criminal de otros.

11. El Encubrimiento Persistente de la Infestación de Arboles de los Terrenos del Hospital Auxilio Mutuo —y la Fabricación de "Maleza". El diccionario nos informa que "Maleza" se refiere a una "espesura de arbustos silvestres, como zarzales o jarales". Las fotos incluidas NO reflejan ninguna "espesura de arbustos", sino una Infestación de Arboles. Las fotos más recientes del 2024 muestran que, aun habiendo secado /cortado los árboles, las raíces brotaron unos retoños. Los retoños se cortaron, pero las raíces tienen que esperar al corte final de los árboles —algo que ya hemos señalado como de urgencia inmediata. La Querella proclama que la propiedad está "LLENA DE MALEZA", lo cual simplemente está *divorciado de la verdad.*

12. La "Maleza" del Auxilio Mutuo. Nuestra propiedad también tiene enredaderas y otras plantas pequeñas que son similares a las que existen en el solar del Auxilio Mutuo. Las fotos muestran el frente de ese solar; y también que esas plantas y enredaderas han persistido a través de los años 2023 y 2024. Aparentemente el Municipio de San Juan no considera esa vegetación como "Maleza", ni tampoco como "Estorbo Público".

13. Ni Estructura; Ni Abandono; Ni Tampoco Ningún Interés Público —Un Divorcio de la Verdad. La Querella proclama una "ESTRUCTURA ABANDONADA EN MALAS CONDICIONES"; pero esas "condiciones" no se definen, y lo que se pretende es arbitrariamente colocar una X en algunos encasillados. Lo que resulta es Encubrimiento y el Divorcio de la Verdad que a su vez NO releja ningún Interés Público —incluso se pretende encubrir /ocultar un peligro inminente.

Alcalde Romero, le ruego una atención prioritaria al peligro inminente de los árboles en cuestión. Incluimos una Carta a LUMA que describe el asunto en detalle; así como la Carta al Municipio de San Juan solicitando apoyo y coordinación. Nunca nos imaginamos que luego de dos (2) años esta situación persistiría sin solución. Por otro lado, no nos corresponde continuar suplicando a las agencias relevantes que tomen acción en algo que se debió resolver hace largo rato. El Municipio de San Juan ciertamente tiene los recursos y la responsabilidad de tomar el liderato en el asunto — y

particularmente para garantizar la seguridad de los viven, trabajan, y transitan por esa Calle de la ciudad.

En los párrafos anteriores hemos intentado resumir la situación. Simplemente, nos parece que, aun en su condición actual, ninguna persona razonable aceptaría que la referida propiedad es un Estorbo Público —y mucho menos alguien con conocimientos de Ingeniería o Construcción. La Querella presenta un proceso amañado, que refleja Agendas Escondidas; no puede sustentar sus alegaciones; ni tampoco refleja peritaje en esas materias. Lo que surge es que mediante ordenanza, y en menosprecio de los Derechos Civiles, se imponen todo tipo multas y se les confisca la propiedad a los ciudadanos

Para mayor agravio, esto ha ocurrido anteriormente. Por ejemplo, en las fotos fechadas 2013 también se intentó levantar alegaciones de "Abandono", "Estorbo Público", etc. Nótese los Arboles de los terrenos del Hospital Auxilio Mutuo, que eventualmente infestaron nuestra propiedad. En estas ocasiones anteriores —y tras malos ratos y sinsabores— acudimos a los respectivos alcaldes que por fin controlaron la situación.

Alcalde Romero, hoy acudimos a usted. No permita que el error de algunos mancille su administración; y nos arrastren a controversias innecesarias.

Gracias por su atención y consideración en estos asuntos, queda de usted,

Respetuosamente,

HC-03 Box 12913
Carolina, Puerto Rico 00987
Tel: (787) 325-7772

Ramón E. Castro

Ramón E. Castro

CC.: Vanessa Y. Jiménez Cuevas
Directora
Asuntos Legales

D-2

14 de agosto de 2023
Atención: Ms. Elba Negrón Rodríguez
Entregada a la Mano

Referencia: 220P-58289QE-SJ
Municipio de San Juan
Oficina de Permisos – Estorbos Públicos

A Quien Pueda Interesar:

Nos dirigimos al Municipio de San Juan en torno a una situación urgente –de *peligro claro y presente*. Más aún, la temporada de Huracanes añade particular urgencia al asunto.

La situación se describe en nuestra carta a la compañía LUMA; la cual incluimos adjunto. En resumen, se trata de unos árboles que están en peligro de caer. Dichos árboles se ubican en la Calle Ponce 16, Hato Rey; y no solo afectan la cercana línea eléctrica, sino que constituyen una seria amenaza para los transeúntes y los autos que pasan por el lugar.

Ya abordamos este asunto en nuestra carta al Municipio con fecha del 25 de mayo de 2022. Lamentablemente, al cabo de un año todavía persiste la situación. Por otro lado, la foto incluida demuestra parte de labor que hemos realizado en el lugar. Notificamos que el 9 de agosto de 2023 obtuvimos la Orden 462278 del Municipio de San Juan, para el recogido del cúmulo de ramas cortadas que se presentan en la foto.

Le rogamos encarecidamente que el Municipio de San Juan realice cualquier gestión /coordinación para que se atienda con prioridad la remoción de esos árboles peligrosos.

Respetuosamente,

Ramón Castro
HC-03 Box 12913
Carolina, PR 00987

Ramón E. Castro

D-3

09 de agosto de 2023
Referencia: Orden de Servicio WR6123739 (17 de mayo de 2022)
Entregada a la mano

LUMA Energy
Oficina de Monacillos
Rio Piedras, Puerto Rico

A Quien Pueda Interesar:

Las fotos que se incluyen demuestran una situación urgente –de *peligro claro y presente*.

Se trata de unos árboles secos ubicados próximos a la acera, y localizados en:

Calle Ponce 16
Urb. Pérez Morris
Hato Rey, PR 00917
(colinda con terrenos del Hospital Auxilio Mutuo)

Dichos árboles están en peligro de caer; lo que a su vez interfiere con la cercana línea eléctrica; y más aún, constituye una seria amenaza para los transeúntes y los autos que pasan por esa calle. Es fundamental que sean removidos a la brevedad posible. La temporada de Huracanes añade un factor adicional de urgencia.

LUMA tiene los recursos únicos para resolver esta situación. De hecho, las fotos ilustran unos contratistas de LUMA trabajando en esa misma calle; y a simple vista se observa el equipo y el peritaje que son imprescindibles para atender este asunto en forma segura y efectiva. En este aspecto, observamos lo siguiente:

a. Cualquier intento de cortar estos árboles sin el equipo necesario, simplemente provocaría la catástrofe que intentamos evitar.

b. Intentar un corte sin el debido peritaje corre el peligro de electrocución por las cercanas líneas eléctricas.

c. El corte requiere momentáneamente limitar /impedir el tránsito en la calle. Nuevamente, LUMA tiene el personal, los recursos, y la autoridad para realizar esa gestión.

d. LUMA tiene los recursos para efectuar una multiplicidad de gestiones según fuera necesario. Por ejemplo: desconectar temporeramente las líneas eléctricas para facilitar el trabajo; utilizar varias brigadas para agilizar la labor; de ser conveniente, ubicar equipo /trabajar desde el estacionamiento del Hospital Auxilio Mutuo; etc.

e. De las fotos se aprecia que el mero corte de los árboles no debe representar problema para las sierras modernas –el problema consiste en el equipo de acceso; la planificación y control del corte; y la coordinación para realizar la labor en forma segura y efectiva. Simplemente, comenzando por la cima se troza el árbol /ramaje en varios segmentos moderados y manejables –y de manera que cada segmento se disponga en forma segura.

f. Estimamos que, con la debida planificación y ejecución, el proceso se reduce a algunas horas.

g. La casa y el solar ubicado en la Calle Ponce 16 es nuestra propiedad. Al presente está desocupada; y lamentablemente ha sido vandalizada. NO sembramos, NI somos responsables por los árboles que aparecen en la foto. Tampoco somos responsables por la basura, escoria, etc., que otros lanzan sobre nuestra propiedad.
h. Infestación y Desechos. Los árboles en la foto adjunta son producto de una infestación proveniente de los terrenos del Hospital Auxilio Mutuo. El Hospital nada hizo para evitar esta situación –y para exacerbar el problema, cada vez que podaban sus árboles lanzaban los desechos del ramaje sobre nuestra propiedad.
i. En tiempos recientes, el Hospital Auxilio Mutuo eliminó por completo los árboles en su terreno que provocaron la infestación. No obstante, eso no elimina; no disminuye; ni tampoco puede ocultar la responsabilidad del Hospital.
j. Orden de Servicio WR6123739 (17 de mayo de 2022). Entre otras cosas, habiéndose controlado un poco los peligros de la pandemia COVID, nos dimos a la tarea de eliminar el problema de la infestación de árboles. Comenzamos a secar los referidos árboles para evitar mayor crecimiento y expansión; así como preparación para su corte y remoción. En aquel momento, al igual que ahora, se hacía evidente que LUMA debía intervenir para remover los árboles más peligrosos. A esos efectos, solicitamos la referida Orden WR6123739.
k. Para sorpresa nuestra, al cabo de 2 meses LUMA sólo cortó la rama más cercana a la línea eléctrica –dejando sin atender el problema fundamental.
l. Nos hemos esforzado en remover la infestación con los recursos a nuestra disposición. La referida foto refleja que de 6 árboles principales, hemos cortado 3 –y estamos en proceso de eliminar el número 4. También se observa un cúmulo de ramas cortadas que dan fe de nuestra labor. Sin embargo, los 2 árboles restantes representan un peligro que está más allá de nuestros recursos –y claman por la intervención de LUMA.
m. El 9 de agosto de 2023 nuevamente llamamos a las oficinas de LUMA para atender este asunto. En vista de los particulares de esta situación, en conversación telefónica nos recomendaron dirigirnos a las oficinas de LUMA en Monacillos; y presentar este resumen con las fotos pertinentes.
n. LUMA debe remover estos árboles a la brevedad posible –o como mínimo, cortarlos a un nivel por debajo del techo de la casa y de la línea eléctrica; lo que a su vez permite terminar el corte con equipo simple. Para agilizar el proceso, permitimos que el ramaje cortado quede sobre nuestra propiedad; de manera que posteriormente gestionaremos su remoción con el Municipio de San Juan.

Gracias anticipadas por su atención y esfuerzos en este asunto. Nuevamente, enfatizamos la urgencia de esta situación –particularmente en la temporada de Huracanes.

Respetuosamente,
Ramón E. Castro
Tel. 787-325-7772

Ramón E. Castro

D-4

25 de mayo de 2022
Entregada a la Mano

Referencia: 220P-58289QE-SJ
Municipio de San Juan
Oficina de Permisos – Estorbos Públicos

A Quien Pueda Interesar:

El 4 de mayo de 2022 acusamos recibo de la Carta #Referencia 220P-58289QE-SJ; copia de la cual se incluye con la presente. Dicha misiva se refiere a nuestra residencia ubicada en la Calle Ponce 16, Hato Rey. Esa residencia ha pertenecido a nuestra familia por generaciones: es el hogar donde nos criamos, y donde se criaron mis hijos. No tenemos palabras para describir la tristeza y el dolor que nos invade al ver la propiedad en sus circunstancias actuales.

No obstante, de entrada debemos señalar que esas circunstancias se han desarrollado en contra de nuestra voluntad; y a pesar de nuestros esfuerzos por combatir la situación.

Las fotos que incluimos ilustran algunas de las acciones que ya hemos tomado a raíz de la referida Carta. A continuación queremos enmarcar la naturaleza del proyecto; y a la vez dirigirnos a las preocupaciones expresadas en la Carta de referencia.

1. La propiedad está Desocupada, no está abandonada. La residencia se encontraba en perfectas condiciones cuando nos trasladamos a la casa de mis padres para atender su enfermedad. Todo era en el área Metropolitana; y no podíamos imaginar el nivel de criminalidad y abuso que arroparía la propiedad. Los impuestos del CRIM se pagan anualmente sin falta.

2. No hay un estado de deterioro; lo que hay es Vandalismo –que es muy distinto. Nos sorprende que la Carta no mencione la destrucción maliciosa que ha sufrido la propiedad; cuando es evidente a simple vista. Nuestros esfuerzos por combatir este asedio también son evidentes. Más aun, este asedio es tan evidente que se ha afectado a otras propiedades en el área.

3. El Vandalismo no es cosa de mantenimiento. Al contrario, para combatir el Vandalismo hemos eliminado el servicio de Agua y de Energía Eléctrica –lo que lamentablemente, hace difícil hasta tareas sencillas. Por otro lado, tuberías y cables también han sido vandalizados.

4. La residencia No presenta problema de seguridad; el problema de seguridad es la plaga de drogadictos y maleantes en la ciudad. Más aun, la propiedad es una víctima de la falta de seguridad en un área que, en un tiempo, era tranquila y familiar.

5. La residencia está aislada, y no representa problema para los solares contiguos. La residencia es una estructura estable; está rodeada en tres lados por un estacionamiento; y el cuarto lado colinda a la Calle Ponce. Difícilmente esto pueda constituir estorbo para persona alguna.

6. Depositar Basura en la propiedad NO es cosa de mantenimiento: es un acto criminal. Nos sorprende que la Carta de Referencia no menciona la enorme cantidad de basura que se ha lanzado sobre la propiedad. A simple vista es evidente que eso no es obra nuestra, y tampoco es nuestra responsabilidad.

7. En nuestras últimas visitas a la propiedad, no hemos constatado ninguna "proliferación de sabandijas". A lo sumo, observamos una familia de gatos que ha hecho su hogar en la residencia; y parece que algunas personas le proveen latas de comida. Por otro lado, se observa que el Hospital Auxilio Mutuo ha colocado 2 enormes recipientes de basura justo al lado de la casa: uno justamente al lado izquierdo, y el otro justo en la parte posterior. De existir alguna "sabandija", es evidente que resulta del Basurero construido por el Auxilio Mutuo, y de los que lanzan basura en el frente de la casa.

8. La casa NO afecta al "entorno"; es el "entorno" quien ha afectado la residencia con una invasión de drogadictos y maleantes; y una masa de basura.

9. La Pandemia ha limitado nuestra capacidad para combatir el asedio. Nuestra edad nos hace particularmente susceptibles a COVID; y nos ha retrasado en muchos aspectos.

10. También hemos sufrido problemas de salud que nos han limitado significativamente. Al presente nos estamos recuperando de una situación médica que nos ha detenido por más de un año. Hace apenas un mes no hubiéramos podido responder como lo hacemos ahora.

11. Arboles NO Maleza. Las fotos incluidas muestran que lo que la Carta de referencia identifica como "maleza" es en realidad las ramas de unos árboles y unas enredaderas. Los árboles son el asunto crítico, ya que pueden interferir con la línea eléctrica; y por su tamaño han dominado el lugar.

12. Remover árboles de ese tamaño, y en un lugar tan restricto, es un asunto delicado parecido a una demolición. El 17 de mayo de 2022 nos comunicamos con la Compañía LUMA (Orden WR6123739) para que realizaron el desganche de forma que se pueda remover los árboles sin impactar la línea eléctrica. En paralelo estamos realizando los cortes a nuestro alcance. Es un proceso largo y tedioso.

13. Los árboles en cuestión no fueron sembrados por nosotros, nacieron en los terrenos del Auxilio Mutuo, e invadieron nuestra propiedad –quebrando una losa de hormigón en el proceso. El Auxilio Mutuo removió los árboles matrices en su terreno, ocultando su responsabilidad. En justicia, también debieron remover los retoños en nuestra propiedad. Observamos además, la costumbre de lanzar ramas y otros desechos vegetales a nuestra propiedad.

Respetuosamente, Ramón E. Castro

Ramón Castro, HC-03 Box 12913, Carolina, PR 00987

D-5

SAN JUAN

OFICINA DE
**ASUNTOS LEGALES**

**Querella y Notificación de Intención de Declarar Propiedad Como Estorbo Publico**

**CERTIFICADO CON ACUSE RECIBO**

Fecha: **26 de febrero de 2024**

Caso Número: **22OP-58289QE-SJ**

Direccion Física: **URB, PEREZ MORRIS**
**CALLE PONCE 16**
**SAN JUAN, PR 00987**

Direccion Postal: **HC 03 BOX 12913**
**CAROLINA, PR 00987**

Estimado (a) señor (a): **CASTRO ADAMES RAMON**:

La Oficina de Asuntos Legales del Municipio Autónomo de San Juan, en adelante la Oficina de Asuntos Legales, realizó una investigación que reflejó que usted es **CALLE PONCE URB. PÉREZ MORRIS HATO REY 16 SAN JUAN PUERTO RICO 00917** (en adelante, el "Bien Inmueble"). Luego de una investigación realizada sobre las condiciones del Bien Inmueble, esta oficina ha determinado que el mismo cualifica para ser declarado "estorbo público", a tenor con el Artículo 4.008 et seq. y 8.001(98) de la Ley 107 de 2020, según enmendada, mejor conocida como el "Código Municipal de Puerto Rico" 21 L.P.R.A. § 7001 (en adelante "el Código Municipal") y el Art. 15.201 et seq. y 15.105(j) del Capítulo XV, del "Código de Urbanismo del Municipio de San Juan", según enmendado por la Ordenanza Núm. 1, Serie 2021-2022, aprobada el 22 de julio de 2021, en adelante el "Código de Urbanismo", los cuales, entre otras disposiciones, definen un estorbo público de la siguiente manera:

> "cualquier estructura abandonada o solar abandonado, yermo o baldío que es inadecuada para ser habitada o utilizada por seres humanos por estar en condiciones de ruina, falta de reparación, defectos de construcción o que es perjudicial a la salud o seguridad pública. Dichas condiciones pueden incluir, pero sin limitarse a, defectos en la estructura que aumentan los riesgos de incendios, o accidentes; falta adecuada de ventilación y/o facilidades sanitarias; falta de energía eléctrica y/o agua potable; y/o falta de limpieza."

- [X] Estructura abandonada
- [ ] Solar abandonado
- [ ] Yermo o baldío
- [X] Estructura inadecuada para ser habitada
- [ ] Estructura en ruina
- [ ] Falta de reparación
- [ ] Defecto de construcción
- [X] Perjudicial a la Salud
- [X] Perjudicial a la seguridad pública
- [ ] Tienen riesgos de incendios
- [ ] Podría causar accidentes
- [ ] Falta de ventilación
- [ ] Facilidades sanitarias
- [X] Falta de energía eléctrica
- [X] Falta de agua potable
- [X] Falta de Limpieza



SAN JUAN

OFICINA DE
**ASUNTOS LEGALES**

El Bien Inmueble se encuentra en **ESTRUCTURA ABANDONADA EN MALAS CONDICIONES Y LLENA DE MALEZA.** Por lo antes expuesto, nos proponemos declarar el Bien Inmueble como estorbo público a tenor con el Artículo 4.008 et seq. del Código Municipal y el Art. 15.203 del Código de Urbanismo, la presente notificación se hace en cumplimiento con el Artículo 4.008 del Código Municipal y el Art. 15.203 del Código de Urbanismo. **Se le apercibe, que tiene un término de veinte (20) días calendarios, los cuales serán contados a partir de la notificación por correo de la presente, para oponerse a la declaración del Bien Inmueble como "estorbo público" y solicitar una vista administrativa ante un Oficial Examinador** para ser escuchado y presentar la prueba documental, testifical y pericial que estime conveniente ante dicho oficial. A la vista, podrá comparecer, por si o representado por abogado, con sus objeciones por escrito y con la prueba testifical, documental y/o pericial que entienda conveniente y necesaria.

## EFECTOS DE LA DECLARACIÓN DE ESTORBO PÚBLICO

Una vez declarada una propiedad como "estorbo público", el propietario vendrá obligado a limpiar o a ejecutar las obras necesarias para eliminar la condición de estorbo público dentro del término de sesenta (60) días a partir de la notificación de la Resolución, salvo que haya solicitado la revisión judicial sobre dicha declaración. Si el propietario no elimina la condición de estorbo público, el Municipio procederá a hacerlo a su costo y reclamará al propietario todos los gastos incurridos en dicha gestión, además de los gastos del procedimiento de declaración de estorbo público, más el interés legal correspondiente a partir del transcurso de los sesenta (60) días. La suma de las cantidades anteriores constituirá un gravamen sobre la propiedad, equivalente a una hipoteca legal tácita, con el mismo carácter de prioridad que una deuda contributiva. El gravamen se hará constar mediante instancia en el Registro de la Propiedad. En aquellos casos en los que el Municipio haya incurrido en el costo de las gestiones y labores de eliminación de la condición de estorbo público como consecuencia de la inacción del propietario, se le impondrá una multa según lo dispuesto en el Artículo 15.206 del Código de Urbanismo. Esta multa será adicional al costo de eliminar la condición de estorbo público y se incluirá dentro del gravamen anteriormente dispuesto, salvo que se efectúe el pago de la misma dentro del término de sesenta (60) días de haber sido debidamente solicitado y notificado por el Municipio. Dentro del término de sesenta (60) días de haberse realizado la última gestión de cobro de las cantidades antes dispuestas, incluyendo las gestiones de localización y/o notificación a la última dirección del dueño, estas resultaren infructuosas, el Municipio presentará la acción judicial que corresponda para el cobro de dinero y consecuente ejecución de la propiedad y su venta en pública subasta, conforme a lo establecido en las Reglas de Procedimiento Civil. El Municipio retendrá la cantidad adeudada por concepto de multas y todos los gastos por las labores de limpieza o eliminación de la condición de estorbo público de la propiedad y deberá consignar el balance restante, si alguno, en una cuenta separada del Fondo General.

El Municipio mantendrá un Inventario de Propiedades Declaradas como "estorbo público" en el que consten todas las propiedades cuya declaración de "estorbo público" haya advenido final y firme. El Municipio denegará cualquier permiso, endoso, certificación o autorización de la competencia municipal que se requiera para el uso o desarrollo de las propiedades declaradas "estorbos públicos" por las cuales se adeude alguna suma por las reparaciones, mejoras o limpiezas realizadas por el Municipio. Tan pronto el propietario o encargado pague la suma adeudada, el Municipio levantará la restricción impuesta.



SAN JUAN

OFICINA DE
**ASUNTOS LEGALES**

Al cumplirse el término de 60 días a partir de la declaración de "estorbo público", la Oficina inspeccionará la propiedad para verificar si se han eliminado las condiciones que la convirtieron en estorbo público. De no haber cesado la condición, se impondrá una multa fija de cinco mil dólares. ($5,000). En aquellos casos en los que una propiedad haya sido declarada estorbo público de manera final por el Municipio y la misma sea declarada nuevamente como estorbo público como parte de un caso distinto y posterior relacionado a la misma propiedad, se impondrá una multa fija de cinco mil dólares ($5,000). La imposición de las multas antes dispuestas es independiente a las multas administrativas que puedan imponerse por el Municipio previo a la acción de declaración de estorbo público de la propiedad, según establecidas en el Artículo 15.213 del Código de Urbanismo.

La propiedad podrá ser removida del Inventario de Propiedades declaradas "estorbo público", a petición de parte, demostrando que la condición de "estorbo público" ha sido eliminada satisfactoriamente a juicio del Municipio y se han pagado las multas impuestas y los gastos incurridos por el Municipio. El Tribunal de Primera Instancia de la Región Judicial de San Juan entenderá en toda solicitud de revisión judicial de cualquier persona adversamente afectada por la determinación del Municipio o la imposición de una multa administrativa. En este caso, se podrá solicitar revisión judicial dentro del término de veinte (20) días contados a partir de la fecha de la declaración de estorbo público o la notificación de la multa impuesta, lo que se advertirá en la notificación de la multa, de conformidad con el Artículo 1.050 del Código Municipal.

La declaración de estorbo publicó, además de lo dispuesto previamente, permitirá al Municipio:

(a) disponer la rotulación de la propiedad como estorbo público;

(b) realizar la tasación de la propiedad a través de un tasador o solicitar la misma al CRIM para determinar su valor en el mercado;

(c) solicitar al CRIM la certificación de deuda de contribución sobre la propiedad; y/o

(d) expropiar el inmueble para su propio uso por motivo de necesidad y utilidad pública. Cuando el inmueble objeto de expropiación tenga deudas, intereses, recargos o penalidades con el CRIM sobre la contribución a la propiedad, se le restará la cantidad adeudada al valor de tasación al momento de calcular la justa compensación. Una vez se le transfiera la titularidad al Municipio, toda deuda, intereses, recargo o penalidades con el CRIM será cancelada en su totalidad.

Además, los inmuebles declarados como "estorbos públicos" formarán parte de un inventario.

Las propiedades incluidas en el Inventario podrán ser objeto de expropiación forzosa, mediante la cual el Municipio vendrá obligado a pagar al titular el justo valor de la propiedad, para su posterior transferencia a toda persona que esté en disposición de adquirirla para su reconstrucción y/o restauración o para hacer una nueva edificación. No obstante, lo anterior, no podrán adquirir propiedades expropiadas por el Municipio aquellos representantes autorizados del Municipio que hayan participado en el proceso que culminó con la declaración de estorbo público de tales propiedades. El procedimiento para la venta de dichas propiedades a terceros será conforme dispone el Art. 4.012 del Código Municipal y el Art. 15.209 del Código de Urbanismo.



OFICINA DE
**ASUNTOS LEGALES**

**Para presentar oposición y solicitar la vista administrativa ante un Oficial Examinador**, deberá acudir a la Oficina de Asuntos Legales del Municipio Autónomo de San Juan en la **Avenida De Diego # 130, Calle 54 SE, Urb. La Riviera, Edificio Trilito 3er Piso, San Juan, Puerto Rico, o a la dirección postal PO Box 70179 San Juan PR 00936-8179. Para más información se puede comunicar al Teléfono (787) 480-3080.**

**Se le apercibe que, de usted no oponerse a la declaración del Bien Inmueble como "estorbo público", dentro de los veinte (20) días siguientes a la notificación por correo de la presente, el Municipio podrá declarar el Bien Inmueble como "estorbo público", sin más oírle o citarle, según dispuesto en el Art. 4.010 del Código Municipal y el Art. 15.203(e) del Código de Urbanismo.**

Expedida en San Juan, hoy 27 febrero de 2024.

Atentamente,

Vanessa Y. Jiménez Cuevas
Directora
Asuntos Legales

**Para realizar trabajos de reparación en el inmueble deberá cumplir con la Reglamentación vigentes de la Oficina de Asuntos Legales del Municipio de San Juan.**



D-6

22 de julio de 2022

Sr. Reinaldo Paniagua Látimer,
Director Ejecutivo del Centro de Recaudación de Ingresos Municipales (CRIM)
— entregado a la mano —

Estimado Sr. Paniagua,

Nos dirigimos a Usted en torno a la situación que reflejan los Anejos incluidos con la presente. Específicamente, nos referimos a la extraña acción de fabricar una Revocación de Exoneración Residencial en forma *RETROACTIVA*.

Establecemos de entrada que la presente *no* es una solicitud de revisión y/o reconsideración; sino que es un llamado a la supervisión y corrección de algo que no tiene fundamento alguno en la ley; resulta arbitrario e irracional; y ofende los conceptos básicos de lo que es justo. NO nos sometemos a la jurisdicción del CRIM; ni a los onerosos procesos adjudicativos relacionados; ya que Usted podrá comprobar que simplemente son improcedentes e innecesarios.

Sr. Paniagua, esta situación puede constituir una imposición indebida a todo un sector de la población. Por consiguiente, lo que se requiere es una acción inmediata de su parte que cancele este tipo de acción indebida –y evite su propagación en el futuro.

A continuación ofrecemos algunos datos que resumen la situación:

1.      Los Anejos se refieren a nuestra residencia ubicada en la Calle Ponce #16, Hato Rey, PR. Esta residencia ha permanecido en poder de nuestra familia por algunos 65 años. Es el hogar donde pasé mi juventud; y es el hogar donde se criaron mis hijos.

2.      Al presente estoy próximo a cumplir 74 años de edad. La residencia permanece en mi poder; y nunca ha sido arrendada o usada para otro propósito que no sea la residencia de nuestra familia. Nuestra intención es que continúe siendo nuestra residencia –a pesar de cualquier contratiempo.

3.      A través de todo este tiempo, la residencia ha disfrutado de Exoneración Residencial; y los pagos al CRIM se han realizado sin falta. Incluso, en años en que el CRIM no nos ha enviado notificación de pago pendiente, hemos realizado el pago correspondiente por nuestra propia iniciativa.

4.      La residencia ha sido Vandalizada por una ola de narcómanos y maleantes –y quizás también por algunos que presumen de ciudadanos honorables. Una breve ausencia para atender la enfermedad de mis padres, dio lugar a la avalancha de vandalismo; y una lucha de rejas y candados que ha persistido hasta el presente. Uno de los aspectos del vandalismo es la destrucción de la cablería eléctrica y la tubería de agua; y pendiente a la reparación de estas facilidades, la residencia no es habitable al momento –a pesar nuestro, y contra de nuestra voluntad.

5.      Es de conocimiento común que las circunstancias que impulsan la situación que contemplamos en la presente nacen de una Crisis Fiscal producto de la deuda descontrolada y descabellada del Gobierno de PR. Esto a su vez produce el intento desesperado de imponer impuestos para obtener fondos a toda costa.

6.      El 12 de julio de 2022 recibimos una avalancha de facturas de parte del CRIM. De golpe y porrazo se pretende imponer las seis (6) facturas descritas en los Anejos A-1; A-2; A-3; A-4; A-5;

A-6. El Anejo A-7 describe las advertencias al dorso de cada de cada factura. Nos sorprende la forma desmesurada de emitir estas facturas; particularmente cuando los requisitos de administración y de Ley señalan que estos asuntos se pudieron atender con anterioridad: por ejemplo, véase Anejo A-8 párrafo ¶-9 mencionando listados preparados en enero de cada año. Como agravante, julio contiene múltiples días festivos; y al final de ese mes vencen /se reducen los descuentos ofrecidos y otros aspectos.

       7.      Revocación de la Exoneración Residencial. El Anejo A-1 representa la revocación de la Exoneración sobre la referida residencia; lo cual multiplica la contribución anual impuesta sobre esa propiedad. No obstante, establecemos lo siguiente:

a.  Hemos PAGADO la Totalidad (100%) de la contribución anual señalada en el Anejo A-1 (19 de julio de 2022)

b.  En estos momentos, NO solicitamos revisión /reconsideración alguna sobre lo señalado en la factura del Anejo A-1.

c.  Nos reservamos el derecho de realizar cualquier reclamo pertinente, en cualquier foro pertinente, en torno a las facturas descritas en los Anejos A-1; A-2; A-3; A-4; A-5; A-6.

       8.      El proceso de revisión administrativa presentado en A-7 NO es aplicable en esta situación. El Anejo A-7 presenta un largo y tedioso proceso de revisión administrativa; y oneroso por demás dado la pérdida de descuentos; la imposición de un régimen que pretende limitar el acceso a recursos legales; etc. Simplemente, ese proceso NO es aplicable:

a.  Ya se ha Pagado la contribución anual; no es asunto de discusión ni de revisión.

b.  El proceso se limita a acciones realizadas al amparo de la Ley 107-2020; en contraste, la Revocación Retroactiva de Exoneración NO forma parte de esa ley –representa una acción ultra vires.

c.  Existen otras leyes y consideraciones más allá de la Ley 107-2020 y del artículo 7.065 de esa ley.

       9.      Fabricar una Revocación Retroactiva de Exoneración Es Contrario a las Leyes que han Regido el CRIM por más de 30 años. El Anejo A-8 demuestra que desde 1991 de ninguna manera se permite que el CRIM imponga Revocación Retroactiva de Exoneración; en particular, la Ley 83-1991 señala lo siguiente:

a.  El Anejo A-8 ¶-1 establece que la acción retroactiva se limita a la Valoración de propiedad que nunca fuera tasada; incluyendo construcción nueva [Art. 3.08(b)], así como segregaciones y lotificaciones [Art. 3.08(d)].

b.  El Art. 3.08(c) también incluye como nunca tasadas mejoras o reconstrucciones sustanciales que incrementan la Valoración de la propiedad previamente tasada.

c.  El Anejo A-8 ¶-2 establece que, a modo de penalidad, se permite la Valoración retroactiva pero solamente en cuanto a los Art. 3.08(a) y Art. 3.08(b); es decir, propiedad nunca tasada, o construcción nueva.

d.  La penalidad de Valoración retroactiva conlleva no sólo un incremento en los impuestos sobre la propiedad; sino también añade que ese incremento se multiplica por 5; y constituye una deuda que es pagadera de inmediato.

       10.     Notablemente, el Anejo A-8 ¶-3 específicamente excluye la residencia principal de cualquier Valoración retroactiva. Por el contrario, se establece que la nueva Valoración solamente se aplicará a la residencia en forma Prospectiva.

11. La Exoneración residencial nada tiene que ver con cambios en Valoración; ni con penalidades retroactivas. Tan es así, que el propio Reglamento 7026 del CRIM reconoce que la Exoneración residencial nada tiene ver con acción retroactiva: [véase Anejo A-8 ¶-4, ¶-5]

a. El Reglamento 7026 está dedicado al tema de Exoneración; se establece en el 2005 y al amparo de la Ley 83-1991. Recoge los señalamientos que ya habían permanecido en vigor por 14 años.
b. El Artículo 29 [Anejo A-8 ¶-5] describe la Terminación De La Exoneración. De ninguna manera se menciona acción retroactiva alguna.

12. Luego de 29 años, el CRIM ahora se rige por la Ley 107-2020; pero al igual que la ley anterior, esta nueva Ley tampoco menciona Revocación Retroactiva de Exoneración alguna. Más aún:

a. La Ley 107-2020 [Anejo A-8 ¶-6] establece que NO pretende efecto retroactivo; y promete salvaguardar los derechos adquiridos –que incluyen los derechos adquiridos al amparo de la Ley 83 - 1991.
b. Al igual que la Ley anterior [véase párrafo 10., supra], la Ley 107-2020 también establece que la acción retroactiva se limita a la Valoración de propiedad; y en particular a las mejoras o reconstrucciones sustanciales que incrementan la Valoración de la propiedad.
c. El Anejo A-8 ¶-7, ¶-8, demuestra que el lenguaje de la Ley 107-2020 Art. 7.041 es muy similar al de la Ley anterior [véase Anejo A-8 ¶-1, ¶-2].
d. En esencia, limitar la acción retroactiva a la Valoración de propiedad es un derecho adquirido establecido en la Ley anterior; conservado en vigor por más de 30 años; y reafirmado al presente en la Ley 107-2020.

13. En esta coyuntura, fabricar una Revocación Retroactiva de Exoneración no se puede categorizar como un mero error o desliz; por lo contrario, queda al descubierto como un acto intencional, indebido, e ilegal. Es necesario identificar las fuentes que dieron lugar a esta situación; para evitar que la misma persista y se propague.

14. La Revocación Retroactiva de Exoneración es una acción ilegal; que resulta en Confiscar y Desposeer la Propiedad de un sector vulnerable de la población. Por ejemplo:

a. El Gobierno se encuentra en quiebra con deudas insostenibles; pero no puede recurrir a confiscar abusivamente la propiedad de un sector vulnerable e indefenso.
b. Una cosa es Revocar la Exoneración y producir un incremento en los impuestos —pero otra cosa es multiplicar ese incremento por 5; fabricar una gran deuda inmediata; y agravar la cosa con la amenaza al ciudadano de intereses, recargos, y embargo.
c. Esto ocurre en momentos de crisis económica en la Isla; que ha resultado en una emigración considerable; exacerbado por aumentos en el costo de vida; agravado por una pandemia; etc. Algunos todavía sufren de los efectos del Huracán María, y de los terremotos.
d. Desocupadas, Vandalizadas, pero NO Abandonadas. En los medios se comenta la situación de las llamadas “casas abandonadas”; pero un examen cuidadoso puede reflejar que en muchos casos no hay ningún “abandono” —sino que por alguna razón la casa simplemente se encontraba desocupada.
e. El Huracán del Vandalismo. Hay múltiples razones para que una casa se encuentre desocupada; y típicamente envuelven o una transición, o una dificultad. Puede ser una simple reubicación; puede ser la enfermedad /muerte del propietario; incluso puede ser una tormenta u otra causa que haga la casa temporeramente inhabitable. Para colmo, el Vandalismo representa un extraordinario agravante;

que inflige miles de $dólares en daños; y también causa que la residencia sea inhabitable. En efecto, el Vandalismo es un segundo Huracán.

f. La Revocación Retroactiva de Exoneración es un Agravante Abusivo, que se activa con el mero hecho de que la residencia se encuentre desocupada. Es un acto ilegal, que pretende infligir daños adicionales a ciudadanos que ya se encuentran bajo serias presiones económicas.

15. La Revocación Retroactiva de Exoneración también se presta para acciones abusivas de parte ciudadanos o entidades codiciosas, que pretenden obtener ventaja y desposeer a ciudadanos vulnerables:

a. Con una exoneración inicial de $15,000; en nuestro caso la Deuda inmediata impuesta por la Revocación Retroactiva de Exoneración es $7,747.50 (varía un poco conforme a la tasa impositiva de cada municipio).
b. $7,747.50 es una cantidad significativa para la mayor de la población de la esta Isla; más aun cuando es pagadera inmediatamente. Esto representa la estocada final para aquellos que apenas pueden enfrentar las presiones de tormentas, mudanzas, vandalismo, herencias, etc.
c. El Anejo A-8 ¶-9 establece que cualquier ciudadano puede iniciar una "revisión"; y así utilizar la Revocación Retroactiva de Exoneración para obligar a otros a liquidar su propiedad.

16. El Reglamento 8931 (Anejo A-8 ¶-10, ¶-11, ¶-12, ¶-13) es Arbitrario, Ilegal, y en forma Disimulada y Oculta pretende imponer la Revocación Retroactiva de Exoneración:

a. El Reglamento 8931 se crea en 2017. En esa coyuntura, la Ley 83-1991 llevaba en vigor 26 años; y el reglamento anterior –CRIM 7026 (Anejo A-8 ¶-4, ¶-5)– llevaba 12 años de establecido. Es decir, la Revocación Retroactiva de Exoneración ya se había rechazado por 26 años.
b. En forma Disimulada y Oculta, el Reglamento 8931 [Anejo A-8 ¶-13] pretende añadir el Art. 28 e.; imponiendo la Revocación Retroactiva de Exoneración "en todo caso".
c. El Reglamento 8931 NO es aplicable; pretende conformidad [Anejo A-8 ¶-10, ¶-11] pero es contrario a Ley 83-1991 y al reglamento anterior CRIM 7026. También es contrario a la ley vigente, Ley 107-2020; lo cual también establece al Reglamento 8931 como obsoleto.
d. Ninguna persona /entidad puede fabricar leyes a su capricho y antojo —y mucho menos para confiscar /apropiarse de la propiedad de otros.

Sr. Paniagua, se nos quiere imponer una deuda indebida de **$7,747.50** [Anejo A-2; A-3; A-4; A-5; A-6], que simplemente no tiene base alguna en ley. Le ruego declare esta deuda nula, de manera que el asunto se resuelva de inmediato. Le ruego además que atienda el reclamo de otros en situación similar.

Gracias anticipadas por su atención y consideración, queda de usted,

Respetuosamente,

Ramón E. Castro

**Ramón E. Castro**

Anejo A- 7

INSTRUCCIONES IMPORTANTES

VERIFIQUE SU NÚMERO DE SEGURO SOCIAL. DE NO ESTAR CORRECTO NOTIFÍQUELO A LA OFICINA REGIONAL DEL CENTRO DE RECAUDACIÓN DE INGRESOS MUNICIPALES (CRIM) MÁS CERCANA, O POR CORREO.

SI EN EL ESPACIO DE TIPO/RATE APARECE UN ASTERISCO (*) SIGNIFICA QUE LA PROPIEDAD ESTÁ UBICADA EN VARIOS MUNICIPIOS. POR LO TANTO, VARIOS TIPOS CONTRIBUTIVOS FUERON UTILIZADOS PARA COMPUTAR SU CONTRIBUCIÓN.

PAGOS

POR CORREO - Las contribuciones pueden ser pagadas por correo (mediante cheque o giro) a favor del CRIM. Asegúrese de incluir su dirección postal y el número de catastro en el cheque. Favor de usar el sobre pre-dirigido y devolverlo con su pago. El cheque cancelado será su evidencia de pago.

EN EL BANCO - Puede hacer su pago en la institución financiera autorizada de su preferencia con la notificación y el cupón de pago aquí incluidos. El cajero sellará la notificación y la devolverá al contribuyente como evidencia de pago.

POR INTERNET O TELÉFONO - Utilizando las principales tarjetas de crédito y débito, ó débito directo a cuentas de cheques o ahorro (www.crimpr.net) ó (787-625-0060 pago automatizado).

CARGO POR PAGO DEVUELTO - Todo cheque y/o pago electrónico a favor del Centro de Recaudación de Ingresos Municipales (CRIM) que sea devuelto, **conllevará un cargo mínimo de $25.00.**

EN LAS OFICINAS REGIONALES Y MUNICIPALES DEL CRIM

COPIAS DE NOTIFICACIÓN - Contribuyentes que han recibido una notificación incorrecta, o que_ _extraviaran la misma, --pueden- obtener duplicados **-en una oficina** de distrito y hacer el pago (con cheque o giro) a favor del CRIM. Los pagos con duplicados de notificación sólo pueden ser pagados en las oficinas
del CRIM o por correo. UN DUPLICADO DE NOTIFICACIÓN NO SERÁ ACEPTADO POR LAS INSTITUCIONES FINANCIERAS.

PARA OBTENER UNA NOTIFICACIÓN DE CONTRIBUCIONES - Si usted no recibe una notificación cada año, comuníquese a la oficina regional del CRIM más cercana a la localización de su propiedad o la oficina del CRIM municipal.

NOTIFICACIONES SUPLEMENTARIAS - Los suplementos son contribuciones separadas y adicionales a la notificación anual. Los mismos tienen que ser pagados a tiempo para evitar cargos por demora.

NOTA - Es responsabilidad del contribuyente pagar sus contribuciones a tiempo. Evite la imposición de intereses y recargos. Todo pago realizado a través de cheque, puede ser convertido a un debito electrónico en su cuenta vía debito directo (ACH) y si éste es devuelto por fondos insuficientes, el cheque será presentado al cobro por vía debito directo (ACH).

De conformidad al Artículo 7.046 de la Ley Núm. 107-2020, el CRIM vendrá obligado a proveer al contribuyente copia de la tarjeta u hoja de tasación de la propiedad inmueble, a solicitud del contribuyente, y luego del pago del arancel que el CRIM establezca para esos fines.

De conformidad al Artículo 7.065 de la Ley 107-2020, si el contribuyente no estuviere conforme con la notificación de la imposición contributiva emitida por el CRIM, podrá solicitar por escrito una revisión administrativa donde se expresen las razones para su objeción, la cantidad que estime correcta, e incluir, si lo entiende necesario, la evidencia o documentos correspondientes. La solicitud de revisión administrativa se presentará dentro del término de treinta (30) días calendarios, a partir de la fecha de depósito en el correo y/o de manera electrónica de la notificación de la contribución provista por el Artículo 7.046 de este Capítulo, siempre y cuando el contribuyente, dentro del citado término: (1) Pague al CRIM el cien por ciento (100%) de la parte de la contribución anual con la cual estuviere conforme y un cuarenta por ciento (40%) de la parte de la contribución anual con la cual no estuviere conforme; o (2) Pague al CRIM la totalidad de la contribución anual impuesta. El contribuyente que solicite una revisión administrativa, según se dispone en este Artículo, no podrá acogerse al descuento por pronto pago dispuesto en este Capítulo, excepto cuando pague la totalidad de la contribución anual impuesta, dentro de los términos prescritos por ley para tener derecho al descuento. La solicitud de revisión se presentará ante el CRIM. Debe seguir los procedimientos dispuestos en los Reglamentos 7221 de 19 de septiembre de 2006 y 7612 de 18 de noviembre de 2008, según aplique. El CRIM deberá emitir su decisión dentro de un término de sesenta (60) días a partir de la fecha de radicación de la solicitud de revisión administrativa por el contribuyente. Cuando el CRIM no conteste dentro de ese término se entenderá que ratifica el estimado de contribuciones notificado al contribuyente. El CRIM podrá extender el término por sesenta (60) días adicionales cuando lo estime necesario para poder llevar a cabo la revisión. Este término de sesenta (60) días adicionales comenzará una vez culminado el término original de sesenta (60) días. El CRIM deberá notificar al contribuyente, dentro de los primeros sesenta (60) días, su decisión de extender el término por dicho periodo adicional. **El procedimiento de solicitud de revisión administrativa deberá completarse como requisito previo para que un contribuyente que no estuviere conforme con esta notificación la impugne judicialmente.** Si el contribuyente no estuviere conforme con la determinación emitida por el CRIM, de conformidad con el inciso (a) de este Artículo, podrá impugnar la misma ante el Tribunal de Primera Instancia dentro del término de treinta (30) días calendario, a partir de la fecha de depósito en el correo y/o a la dirección electrónica que consta en el expediente del contribuyente, lo que ocurra primero, de la notificación de la determinación del CRIM al contribuyente. Si el CRIM, según sea el caso, no emite su determinación dentro de un término de sesenta (60) días, a partir de la fecha de radicación de la solicitud de revisión administrativa por el contribuyente o si el CRIM no notificó la extensión de sesenta (60) días adicionales, el contribuyente podrá impugnar la contribución ante el Tribunal de Primera Instancia dentro del término de treinta (30) días calendario, contados a partir del día siguiente de dicho término de sesenta (60) días iniciales o adicionales, según sea el caso. El contribuyente deberá evidenciar al Tribunal su cumplimiento con el pago contributivo correspondiente. Dicha impugnación judicial deberá presentarse como una Demanda y deberá emplazar al CRIM personalmente a través de su director(a) Ejecutivo(a) o representante autorizado en la oficina central, Carretera Estatal 1 km 17.2, San Juan, Puerto Rico 00926.
**El procedimiento de revisión e impugnación aplica solo a la Notificación del primer semestre.**

# Notas, Incisos de Ley

| Párrafo | Inciso | Texto |
|---|---|---|
| | Ley 83-1991 | Revisión 17 febrero 2017 |
| 1 | Artículo 3.08<br>Revisión de propiedad inmueble;<br>Propiedad **No Tasada**.<br>(21 L.P.R.A. §5058) | El Centro de Recaudación procederá a hacer un plan que permita la revisión constante de la propiedad inmueble, a fin de mantenerla al día, bien por modificaciones por depreciación debido al uso o por cualesquiera de los factores indicados en los incisos (b), (c) y (d) de este Artículo.<br><br>En cuanto a la propiedad **no tasada**, el Centro en su obligación continua de mantener al día el catastro, la clasificación y tasación de la propiedad inmueble, deberá tasar:<br>(a) Toda propiedad que no haya sido tasada […];<br>(b) toda nueva construcción;<br>(c) las mejoras o reconstrucciones sustanciales **no tasadas**, realizadas a una propiedad inmueble que haya sido tasada anteriormente;<br>(d) las segregaciones y lotificaciones pendientes […] |
| 2 | Artículo 3.08<br>Retroactivo | La imposición, notificación y cobro de las contribuciones correspondientes a la propiedad indicada en los incisos (a) y (b) de este Artículo sólo podrá ser retroactivo hasta cinco (5) años contados desde la fecha en que se realice la tasación a dicha propiedad |
| 3 | Artículo 3.08<br>Prospectivo | En el caso de las propiedades indicadas en el inciso (c) de este Artículo que constituyan la residencia principal del contribuyente, la imposición, notificación y cobro de las contribuciones correspondientes será prospectivo a partir de la fecha en que se realice la tasación |
| | CRIM Reglamento 7026<br>7 de septiembre de 2005 | Reglamento Para Exonerar A Los Propietarios Del Pago De Contribuciones Sobre La Propiedad Inmueble Dedicada Para Fines Residenciales |
| 4 | Artículo 5 - Residencia | El dueño o su familia deberá residir en la vivienda objeto del beneficio contributivo, sin que reciba renta directa o indirecta por su ocupación. |
| 5 | Sección 9<br>Terminación De La Exoneración Contributiva<br><br>Artículo 29 | Cuando Se Pierde El Beneficio Contributivo<br>a. Cuando para la obtención de la misma se utilizare una declaración, constancia, o información fraudulenta, o se constatare, fuera de toda duda razonable, la omisión u ocultación manifiesta de detalles que permitan al CRIM efectuar el cómputo correcto de la exoneración.<br>b. Cuando se vendiere, cediere o traspasare el dominio de la propiedad objeto del beneficio contributivo, siendo efectiva |

| | | |
|---|---|---|
| continúa 5 | | la pérdida de dicho beneficio en tales casos, al primero de enero siguiente a la fecha en que se vendiere o traspasare el dominio de la propiedad.<br>c. Cuando el primero de enero anterior a cualquier año fiscal la propiedad objeto de exoneración contributiva estuviere arrendada, produjera o no ingresos directos o indirectos al dueño exonerado del pago de contribuciones.<br>d. Cuando al primero de enero anterior a cualquier año económico la propiedad objeto de exoneración contributiva no estuviere ocupada por su dueño y/o su familia y ésta no estuviere en condiciones sanitarias de uso y disponible para usarse en un futuro inmediato al primero de enero. |
| | Ley 107-2020 | Revisión diciembre /2021 |
| 6 | Artículo 1.004 | Efectos Retroactivos de la Ley<br>Lo dispuesto en este Código **no tendrá** efecto retroactivo, si se dispusiere expresamente lo contrario, una debe ser para no perjudicar los derechos adquiridos al amparo de una legislación anterior. |
| 7 | Artículo 7.041<br>Revisión de propiedad inmueble;<br>Propiedad **No Tasada**. | El CRIM mantendrá un plan que permita la revisión constante de la propiedad inmueble, a fin de mantenerla al día, bien por modificaciones por depreciación debido al uso, por **mejoras no tasadas**, o por cualesquiera, factores indicados en este Artículo. Esta revisión deberá efectuarse de acuerdo a las normas de valoración que estén vigentes al momento de la revisión de la tasación.<br>En cuanto a la propiedad **no tasada**, el CRIM en su obligación continua de mantener al día el catastro, la clasificación y tasación de la propiedad inmueble, deberá tasar:<br>(a) propiedades que no hayan sido anteriormente tasadas;<br>(b) construcciones nuevas;<br>(c) mejoras, ampliaciones o reconstrucciones sustanciales **no tasadas**, realizadas a una propiedad inmueble que haya sido tasada anteriormente;<br>(d) segregaciones y lotificaciones. |
| 8 | Artículo 7.041<br>Retroactivo | La imposición, notificación y cobro de las contribuciones tasadas por el CRIM en virtud de este Artículo solo podrá ser retroactiva hasta cinco (5) años contados desde la fecha en que se realice la tasación a dicha propiedad |
| 9 | Artículo 7.043<br>Registro de Tasación | Tan pronto como fuere posible, después del primero (1°) de enero de cada año, será deber del CRIM preparar una lista de propiedades que a juicio del CRIM o su agente autorizado debieran tasarse o revisar su tasación según dispuesto en este Capítulo, o cuya revisión se hubiere pedido por el<br>o dueño de la propiedad,<br>o por las autoridades del municipio en que estuviere radicada, |

| | | |
|---|---|---|
| 9 | | o o por cualquier ciudadano, para imponerles la contribución correspondiente. |
| | CRIM Reglamento 8931 17 de febrero de 2017 | Reglamento Para Exonerar A Los Propietarios Del Pago De Contribuciones Impuestas Sobre La Propiedad Inmueble Dedicada Para Fines Residenciales |
| 10 | Articulo 1 Base Legal | Este Reglamento se promulga de conformidad con el Artículo 2.02 de la Ley Núm. 83 de 30 de agosto de 1991, según enmendada, conocida como "Ley de Contribución Municipal Sobre la Propiedad de 1991 |
| 11 | Articulo 2 Alcance Y Propósitos | Este Reglamento tiene como propósito establecer el procedimiento a seguir para instrumentar el Artículo 2.02 de la Ley Núm. 83, antes citada, […] |
| 12 | Artículo 28 a., b., c., d., Cuando Se Pierde El Beneficio Contributivo | Sección 8 Terminación De La Exoneración Contributiva<br><br>La exoneración contributiva que se provee por ley y este Reglamento cesará inmediatamente:<br>a. Cuando para la obtención de la misma se utilizare una declaración, constancia, o información fraudulenta, o se constatare, fuera de toda duda razonable, la omisión y ocultación manifiesta de detalles que permitan al CRIM efectuar el cómputo correcto de la exoneración.<br>b. Cuando se vendiere, cediere o traspasare el dominio de la propiedad objeto del beneficio contributivo, siendo efectiva la pérdida de dicho beneficio en tales casos, al primero de enero siguiente a la fecha en que se vendiere o traspasare el dominio de la propiedad<br>c. Cuando el primero de enero anterior a cualquier año fiscal la propiedad objeto de exoneración estuviere arrendada, produjera o no ingresos directos o indirectos al dueño exonerado del pago de contribuciones.<br>d. Cuando al primero de enero anterior a cualquier año económico la propiedad objeto de exoneración contributiva no estuviere ocupada por su dueño y/o su familia y ésta no estuviere en condiciones sanitarias de uso y disponible para usarse en un futuro inmediato al primero de enero. |
| 13 | Artículo 28 e. Retroactivo | e. En cualquier caso, que el contribuyente no informe cualquier cambio en circunstancias, y se identifique que procede la revocación de una exoneración indebida, el CRIM podrá expedir recibos solamente para el año corriente y cinco (5) años anteriores. |

D-7

Entregada a la Mano

11 de abril de 2013

Hon. Carmen Yulín Cruz Soto
Alcaldesa del Municipio de San Juan

Honorable Alcaldesa,

Acudimos a usted ante el asedio de la Policía Municipal de San Juan en asuntos que nunca debieron de ocurrir; y donde ya se estableció que no habrían de repetirse. Se trata de la residencia localizada en la Calle Ponce 16, y que ha sido el hogar de mi familia por varias generaciones (ya van 55 años). La misma disfruta de una excelente ubicación en un buen vecindario, y de fácil acceso a puntos importantes de la Capital. La inspección más somera podrá constatar que la residencia no es, y *nunca ha sido*, un estorbo público –todo lo contrario, es una propiedad *codiciada* por muchos.

Hace más de 10 años confrontamos de la enfermedad de mis padres producto de los estragos inevitables de la vejez. En lo que pensamos sería sólo un período temporero, nos trasladamos hacia la finca de mis padres para proveerles asistencia y apoyo. Lamentablemente, el problema se extiende y se complica con la muerte de mi padre –y para colmo de males, sufrimos el escalamiento de nuestra residencia. Pero como si fuera poco, es precisamente en esos momentos difíciles y amargos que aparece el Policía José Rosario Pérez (placa 761) de la Policía Municipal de San Juan; y sin fundamento alguno procede a emitir boletos en contra nuestra. Adjunto incluimos copia de 10 Boletos consecutivos que emitió el Policía Rosario Pérez en contra nuestra en forma completamente arbitraria, irracional, y sin compunción alguna. A pesar de nuestros reclamos, nunca hemos visto ni recibido evidencia alguna que ni remotamente pueda sustentar la acción de este llamado Policía.

Alcaldesa, en aquel momento acudimos a su predecesor, el Sr. Santini, según se refleja en la carta incluida adjunto con fecha del 18 de noviembre de 2003. Aparentemente, la oficina del Sr. Santini comprendió la naturaleza impropia de las acciones de la Policía Municipal, de suerte que en los últimos 8 años no hemos tenido intervención alguna de ese tipo; y continuamos atendiendo nuestra propiedad privada como de costumbre. Entendíamos que el asunto quedó claro; y que aquella situación no habría de repetirse.

Ahora, con el cambio de administración, algunas personas /entidades /intereses aparentemente pretenden regresar a las prácticas cuestionables del pasado. Para nuestro asombro y sorpresa, el 28 de marzo de 2013 recibimos la Citación incluida adjunto; que a su vez intenta *fabricar* un llamado Caso 11-01-7668; y la cual proclama que nuestra residencia es un "Estorbo Público". Pero más aún, es el mismo y antes mencionado Policía Rosario Pérez (placa 761) quien pretende fabricar este caso: se establece que los hechos están relacionados con el 20 de marzo de

2013, pero una vez más no se establece indicación o señalamiento alguno que describa los hechos –y mucho menos que pueda justificar un alegato de "Estorbo Público".

En la mañana del 8 de abril de 2013 acudimos a las Oficinas Centrales de la Policía Municipal de San Juan; y en el Depto. Implantación de Ordenanzas nos dirigen precisamente al mismo y mencionado Policía Rosario Pérez. Un breve resumen de lo discutido incluye lo siguiente:

a) De inmediato solicitamos una descripción y evidencia de los hechos que alegadamente sustentan el Caso en cuestión. El Policía Rosario Pérez no pudo ni siquiera mencionar hecho alguno relacionado con el 20 de marzo de 2013; ni mucho menos proveer fotos o la más mínima evidencia que sustentara una alegación de "Estorbo Público".

b) Increíblemente, el Policía Rosario Pérez nos muestra un expediente con una foto fechada enero 2011 –hacen ya más de 2 años. Se trataba de una foto del área de la marquesina de la residencia, y que *tampoco* puede justificar alegaciones falsas de "Estorbo Público". Hasta la numeración del llamado "Caso 11-01-7668" sugiere que data del 2011; pero es sólo ahora, con el cambio de administración, que se pretende activar esas alegaciones.

c) Preguntamos específicamente sobre quién había generado una querella; a lo cual el Policía Rosario Pérez no pudo precisar con exactitud persona o entidad alguna. Nos mencionó que el personal de la Policía Municipal de San Juan adscrito al cuartel de Quintana patrullaban aquel área; y que bajo la supervisión de una tal "Sgto. Bonilla" pudo haberse generado la foto de enero 2011. Ante esto, le señalamos al Policía Rosario Pérez que cualquiera que patrullara el área hubiera observado que las alegaciones de "Estorbo Público" eran improcedentes –y particularmente porque es evidente que a través de los años nosotros hemos realizado mantenimiento periódico de nuestra propiedad conforme a las circunstancias.

d) En resumen, independientemente de las acciones de personas /entidades desconocidas, es meridianamente claro que el Policía Rosario Pérez *fabricó* el llamado Caso 11-01-7668; dando paso a alegaciones de "Estorbo Público" sin fundamento alguno. Más aún, es cuestionable si el Policía Rosario Pérez tan siquiera ha visitado el lugar en tiempos recientes.

e) Increíblemente, el propio Policía Rosario Pérez nos confiesa que reconoce que en el área hay otras propiedades que sufren de grandes problemas; a tal extremo que algunas pueden considerarse como "Estorbo Público". Pero nos informa que *misteriosamente* "no consiguen" a esos dueños; lo que aparentemente implica que la Policía Municipal simplemente no interviene con esas propiedades –y al parecer pretende *ignorarlas por completo*.

f) En contraste, el Policía Rosario Pérez nos informa que nosotros somos "el único que hemos podido conseguir". Aparentemente, la Policía Municipal considera que este pretexto les permite intervenir con nosotros a su capricho y antojo; sin fundamento alguno; y en forma completamente arbitraria e irracional.

g) El Policía Rosario Pérez llegó hasta allegar que el llamado Caso 11-01-7668 era "leve" y que se podía "cerrar" con facilidad. Pero en todo momento se negó a aceptar que no había

fundamento alguno; y no corrige ni siquiera aun cuando le mostramos evidencia con fotos recientes (vea adjunto). Es decir, no hay nada que cerrar porque el "Caso" es NINGUNO.

h) Los pretextos del Policía Rosario Pérez giraban en torno a la vegetación. Esto llegó al extremo de alegar que no puede haber vegetación ni siquiera en la parte posterior de la casa – a más de 60 pies de la acera, y dónde existe una "canal" de tierra que siempre estuvo sembrada de plantas de varios tipos. Alegadamente esto "no se puede ver" desde la acera.

i) Nosotros no aceptamos las alegaciones del Policía Rosario Pérez; pero en un intento de eliminar este tipo de *pretexto*, ya el día anterior (7 de abril) habíamos lanzado herbicida en TODO el área frontal de la residencia. Le informamos al Policía Rosario Pérez nuestra intención de simplemente *eliminar por completo* la mayor parte de la vegetación; pero que el herbicida toma algunas 2 semanas en matar las raíces, y quizás otra semana en lo que se descompone la planta. Naturalmente, luego de un tiempo habrá retoños a los cuales nuevamente se les aplicará herbicida.

j) Curiosamente, en la tarde del mismo día 8 de abril de 2013 recibimos un mensaje del Policía Rosario Pérez indicando que se disponía a "cerrar" el llamado "Caso" que él mismo fabricó.

Alcaldesa, acudimos a usted porque la experiencia nos enseña que tratándose del Policía Rosario Pérez y la Policía Municipal de San Juan, tan pronto eliminamos un pretexto, surge otro. Por otro lado la naturaleza de este asunto es de importancia crucial. Baste considerar las fotos incluidas de la Urb. San Francisco, y en el área localizada casi de frente a la entrada de las Oficinas Centrales de la Policía Municipal. Se trata de una urbanización muy conocida, prestigiosa, y elegante –y nos parece que ninguna persona razonable aceptaría las alegaciones del Policía Rosario Pérez para declarar este lugar como "Estorbo Público".

Alcaldesa, de la misma forma le ruego que visite personalmente el área de nuestra residencia: Calle Ponce, Calle Mayagüez, Ave. Ponce de León. Podrá constatar personalmente que nuestra residencia no es un "Estorbo Público"; y que el Policía Rosario Pérez intenta fabricar una "pajita" en nuestro ojo, mientras ignora las" enormes vigas" en otras propiedades que de verdad se encuentran en mal estado. Le ruego que no ignore estas propiedades en mal estado; ya que forman parte de mi comunidad y me entristece verlas así. En estos momentos de recesión económica, le ruego que considere el área y la situación que impactó a esas personas resultando en los efectos negativos sobre la propiedad. En algunos aspectos se necesitará la acción gubernamental; pero en muchos otros habrá que considerar las enfermedades, las situaciones personales, y las vicisitudes económicas que agobian a esas personas –en vez de complicarles la vida con alegaciones sin fundamento de "Estorbo Público".

Nuestro ánimo no es suscitar controversia alguna: simplemente, nuestra residencia no es un "Estorbo Público", y las alegaciones a esos efectos no proceden. Nosotros teníamos gran necesidad de que la Policía defendiera nuestra propiedad –pero no lo hicieron. Si no pueden defender la vida y la propiedad, por lo menos que no molesten...

Le ruego nos conteste a la brevedad posible; y espero que por fin se atemperen estas acciones innecesarias de la Policía Municipal. Deseándole éxito en su nueva gestión gubernamental, queda de usted,

Respetuosamente,

Ramón E. Castro

Ramón E. Castro

HC-03 Box 12913
Carolina, Puerto Rico 00987
Tel: (787) 752-2654

D-8

27 de octubre de 2003

Col. Adalberto Mercado
Director
Depto. de Policía y Seguridad Pública San Juan Ciudad Capital
P. O. Box 70179
San Juan, P.R. 00936-70179

Estimado Col Mercado,

Nos dirigimos a usted en torno a lo que se nos informa es el expediente 03-74050 del Departamento de Ordenanzas; atendido por el oficial Juan Rosario Pérez, placa No. 761. El asunto gira en torno a mi residencia, que ha permanecido en nuestra familia por más de 45 años. El año pasado mi padre, ya de 91 años de edad, enfermó de gravedad. Esto complicó una situación que ya era difícil por la salud delicada de mi madre. Ante la emergencia, y siendo su único hijo en Puerto Rico, me trasladé a vivir en la residencia de mis padres. Pensé que sería algo temporero… Lamentablemente, la situación sólo se complicó más con una hospitalización prolongada de mi padre, durante la cual eventualmente murió.

El resultado de lo anterior es que no he habitado mi residencia en más de año y medio; y las circunstancias no nos han permitido atender el lugar en la forma que merece. Para colmo de males, durante este período también hemos sufrido el embate continuo de criminales y maleantes que ya han realizado varios escalamientos al lugar.

El oficial Rosario Pérez se dirige a nosotros en torno a una querella por crecimiento excesivo de la vegetación en el patio delantero de la residencia; junto a otros asuntos producto de la acción criminal sobre la residencia. El 29 de septiembre de 2003 nos comunicamos con el oficial Rosario Pérez indicando que sin lugar a dudas nuestra intención era realizar el debido mantenimiento, que se había retrasado por razones ajenas a nuestra voluntad. No obstante, aclaramos que los destrozos a los portones y los remedios temporeros que se realizaron, no eran producto de falta de mantenimiento –sino de la flagrante acción criminal. En particular, indicamos que no aceptamos responsabilidad alguna por el depósito ilegal de basura en aquel área por parte de terceras personas irresponsables de aquella vecindad; y expresamos nuestra sorpresa de que el municipio no hubiera recogido la basura toda vez que gran parte de la misma se encontraba a simple vista y en la acera pública. El oficial Rosario Pérez insistió en responsabilizarnos por todos los sucesos, incluyendo el asunto de la basura; el oficial también nos comunicó que nuestra "actitud no era positiva".

Preocupados por la situación, el 1 de octubre de 2003 acudimos al Depto. de Ordenanzas y nos comunicamos con Ms. Carol Paulino Peralta. De una parte, se nos concedió hasta el 30 de octubre para realizar el mantenimiento; pero de otra parte pudimos constatar que la posición del oficial Rosario Pérez aparentemente surge en cumplimiento de la política establecida en el

Depto. de Ordenanzas. Dicha política aparentemente descansa en una interpretación desacertada de la Ordenanza No. 10 sobre Estorbos Públicos; y que no parece considerar que dicha Ordenanza se dirige primordialmente a casos severos de estructuras decrépitas y situaciones extremas que no permiten discusión. Una cosa es hablar de desyerbar un patio delantero; pero otra cosa es tratar de declarar insegura una residencia. No se trata de una estructura en ruina, sin puertas ni ventanas; ni tampoco de portones que se desintegraron de simple oxidación. Más aun, no se puede culpar a la estructura por los destrozos causados por el asedio criminal.

La situación es aun más incongruente en torno al asunto de la basura. A pesar de que no tenemos responsabilidad alguna por estos desperdicios, se pretende responsabilizarnos a cualquier costa. El resultado es una verdadera aberración burocrática: el Municipio de San Juan (Depto. de Ordenanzas) nos amenaza con un boleto por no recoger una basura que no es nuestra; ¡pero nos señala que debemos llamar al mismo Municipio de San Juan ("San Juan a Su Servicio") para que recoja esa misma basura que se encontraba en la acera y a simple vista!

Col. Mercado, hemos sido víctima de acciones ilegales y criminales; no es razonable que el Municipio de San Juan, en vez de protegernos, pretenda penalizarnos por esas acciones de terceros. No podemos aceptar que se pretenda "fabricar" un caso o unos hechos que no corresponden a la realidad. Nuestra residencia no es una estructura abandonada: por el contrario, esta ubicada en un lugar respetable; y aun sin el mantenimiento que merece, la estructura es *codiciada* por muchos.

El 1 de octubre también comunicamos nuestras preocupaciones al Teniente Jimmy Hernández. Le reiteramos que nuestro ánimo no contempla propulsar controversia alguna; y nuestro compromiso es el de cumplir con todo lo que nos corresponde. No obstante, la aplicación desacertada de la Ordenanza No. 10 nos obliga a solicitar que se aclare la situación. La aplicación rígida y desacertada de prácticamente cualquier ley o reglamento puede redundar en un atropello de los derechos civiles de los ciudadanos. Es menester entonces la intervención de los directores de la agencia; de suerte que aporten la madurez, la sensatez, el profesionalismo, y la buena fe necesaria para atemperar los reglamentos y hacer justicia.

Así pues, le rogamos su intervención para proteger nuestra residencia y lograr que esta situación no tenga mayor consecuencia. Gracias anticipadas por su atención y consideración en estos asuntos. Sin otro particular por el momento, queda de usted

Respetuosamente,

Ramón E. Castro

Ramón E. Castro

HC-03 Box 12913
Carolina, Puerto Rico 00987
Tel: (787) 752-2654

D-9

Entregada a la Mano

8 de diciembre de 2003

Hon. Jorge Santini
Alcalde del Municipio de San Juan

Honorable Alcalde Santini,

Nos dirigimos a usted nuevamente en referencia a nuestra carta del 18 de noviembre de 2003. Dado la urgencia del asunto, acudimos a su oficina el 4 de diciembre de 2003 en busca de una contestación a nuestra misiva inicial.

En esa ocasión se nos informó que el asunto había sido referido de nuevo al Col. Mercado de la Guardia Municipal de San Juan, y se nos facilitó un número telefónico para contactar a dicho a oficial. Esa misma tarde hicimos contacto telefónico con la oficina del Col. Mercado, donde una vez más nos atiende el Tte. Jimmy Hernández; y a su vez nos invita a pasar a las oficinas de la Guardia Municipal para discutir el asunto. Así pues, al día siguiente, el 5 de diciembre de 2003, acudimos a la oficina del Col. Mercado, donde nos recibe el Tte. Hernández y acto seguido nos lleva a reunión con la Tte. María Figueroa de la Sección de Implantación de Ordenanzas. El resultado de lo que se nos presentó solo sirve para exacerbar el asunto, y acrecentar nuestra preocupación. En resumen:

a. A pesar de nuestras comunicaciones del 1 de octubre de 2003; y del 29 de octubre de 2003, el Col Mercado no ha tomado acción alguna en el asunto.

b. Por segunda vez se nos niega acceso al expediente de la querella que demuestre quiénes dieron origen a la misma; cuáles fueron las alegaciones que se realizaron; y qué evidencia se presentó para sustentar esas alegaciones. A través de todo este proceso en ningún momento se nos ha demostrado evidencia alguna que justifique las acciones de la Guardia Municipal.

c. La Tte. María Figueroa establece que en un momento futuro rendirá un informe al Col. Mercado; que a su vez rendirá un informe al Honorable Alcalde de San Juan.

d. No obstante, la propia Tte. Figueroa indica que no esperará ni al informe o indicaciones del Col. Mercado, ni tampoco a la revisión del Alcalde Jorge Santini. Por el contrario, se nos informa que no conforme con la imposición indebida de multas; la Guardia Municipal insiste en un patrón de represalia y hostigamiento, y ahora amenaza con declarar la propiedad un "estorbo público".

Sr. Alcalde, hemos solicitado reiteradamente la intervención de los altos oficiales del gobierno municipal de manera que aporten la sensatez, profesionalismo, y buena fe necesarias para atemperar este asunto –que nunca debió haber ocurrido en primer lugar. El hogar de mi familia por 45 años nunca ha sido "un riego a la salud y seguridad" de aquel vecindario; sin embargo, la Guardia Municipal insiste obcecadamente en la aplicación de la Ordenanza No. 10 en una gestión que no tiene relación alguna ni con una emergencia policial, ni tampoco con la seguridad y seguridad de ningún vecindario. A pesar de nuestros llamados a la reflexión, elementos de la Guardia Municipal no detienen su patrón de represalia; y se muestran dispuestos a abusar de todo el poder le confiere la ley en contra nuestra. Ante este patrón de hostigamiento, y para defendernos parcialmente de posibles represalias adicionales, hemos sido coaccionados a pagar la multa de $2000 que injustamente impuso la Guardia Municipal.

Honorable Alcalde Santini, le rogamos su intervención inmediata en una situación que se deteriora, y parece fuera de control. Nos parece que, como mínimo, las acciones de la Guardia Municipal en contra nuestra deben detenerse hasta que usted se exprese en torno a este asunto. Nosotros no somos criminales, y no entendemos por qué nos hostiga la Guardia Municipal de San Juan.

Confiamos en su atención inmediata a este asunto que cada vez cobra mayor urgencia. Así mismo, albergamos la esperanza de que toda esta situación se detenga; y que la Guardia Municipal desista de su intervención indebida en nuestra propiedad privada.

Respetuosamente,

Ramón E. Castro

Ramón E. Castro

HC-03 Box 12913
Carolina, Puerto Rico 00987
Tel: (787) 752-2654